**HESS et al. v. FACTORS CORPORA-
TION OF AMERICA.**

No. 8335.

United States District Court
E. D. Pennsylvania.

May 29, 1950.

See also 80 F.Supp. 727.

Lester S. Hecht, Philadelphia, Pa., Philip Ringer, Chicago, Ill., for plaintiffs.

David Bortin, Philadelphia, Pa., for defendant.

BARD, District Judge.

This is a civil action to recover $20,576.-79 as the cost of certain cattle purchased by the plaintiffs for another, plus their commissions and incidental expenses incurred by them. On the basis of the pleadings and the testimony, I make the following special Findings of Fact:

1. The plaintiffs are Leo R. Hess, Walter Barnholt, Segel H. Hess and Bertha M. Hess, Copartners, trading as Moog & Greenwald, all of whom are residents and citizens of Illinois.

2. The defendant is Factors Corporation of America, a Pennsylvania corporation which has its principal office in Philadelphia, Pennsylvania.

3. The matter in controversy, exclusive of interest and costs, exceeds $3,000.

4. In 1946 and 1947 the plaintiffs were engaged in business at Union Stockyards, Chicago, Illinois, as commission buyers of cattle and livestock for other people.

5. The defendant is engaged in the business of factoring accounts and financing inventories, and in order to secure its advancements it is given a lien on the merchandise by the accommodated party.

6. In January 1946 the plaintiff commenced to act as commission buyers of cattle for Louis A. Cross Company (hereinafter called Cross), a New Jersey corporation which had its principal place of business in Pitman, New Jersey. Cross was engaged in the business of slaughtering cattle and selling the meat and by-products on the wholesale market.

7. At first, the cattle purchased by the plaintiffs on behalf of Cross would be shipped by freight to Elsmere Junction, Delaware, on consignment to the plaintiffs. Upon telegraph notice of the amount due, Cross was required to pay the plaintiffs the full amount due on the cattle, including the purchase price, commissions, and incidental charges, before the plaintiffs would release the bill of lading to Cross so that Cross could obtain the cattle from the railroad. This was accomplished by a sight draft drawn on Cross.

8. On January 28, 1946 the defendant entered into two written agreements with Cross.

9. The first agreement provided that the defendant would purchase the accounts receivable of Cross and advance 90% of the money immediately and the balance on collection less commission charges. All collections on these accounts were to be turned over to the defendant. Louis A. Cross, president of Cross, personally guaranteed the performance of this agreement.

10. The second agreement provided that the defendant would advance 75% of the price of the inventory purchased if Cross would advance 25%[1]. Under this agreement, Cross would notify the defendant of the amount due on each shipment of cattle, verified by the telegram from the plaintiffs, and would give the defendant a check for 25% of this amount and a note with lien attached for the full amount. The defendant would then deposit its own check for the full amount in the Corn Exchange National Bank in Philadelphia with instructions to transmit this amount to the Drovers National Bank in Chicago for credit to the plaintiff's account.

11. Under this arrangement the plaintiffs would usually receive payment of each shipment of cattle before the shipment arrived at Elsmere Junction, Delaware.

12. Because of this arrangement, the plaintiffs thereafter consigned the cattle on a bill of lading directly to Cross without drawing sight drafts.

13. This method whereby the plaintiffs received payment immediately from the de-

---

[1] The ratio of 75-25 was not stated in the agreement; however, both parties admitted in their testimony that this was the ratio.

fendant and shipped the cattle directly to Cross began late in January or early in February 1946, and continued through April 2, 1947.

14. On April 3, 1947 the plaintiffs, upon the oral request of Cross, shipped to Cross 25 head of cattle which the plaintiffs had purchased for Cross on that or the previous day. The purchase price of these cattle was $7,029.60; the plaintiffs' commissions were $19.75; the incidental expenses were $2.63.

15. By telegram dated April 3, 1947 the plaintiffs notified Cross of this shipment and that the total amount due the plaintiffs was $7,051.98.

16. The April 3rd shipment of cattle was turned over to and received by Cross on April 5, 1947, without plaintiff having received payment for the shipment.

17. On April 7, 1947, the plaintiffs, upon the oral request of Cross, shipped to Cross 43 head of cattle which the plaintiffs had purchased for Cross on that or the previous day. The purchase price of these cattle was $13,487.90; the plaintiffs' commissions were $32.35; the incidental expenses were $4.56. The total amount due the plaintiffs for this shipment was $13,524.81.

18. The April 7th shipment of cattle was turned over to and received by Cross on April 10, 1947, without plaintiffs having received payment for the shipment.

19. On April 5 or 7, 1947 a meeting was held between Louis A. Cross, president of Cross, Leonard L. Zeidman, president of defendant, their respective attorneys, and two other persons.

20. This meeting was held to discuss Mr. Cross' conversion to his own or the company's use of a large amount of receipts from invoices which, under the first agreement of January 28, 1946, were to be turned over to the defendant, and to discuss Cross' accumulation of a large amount of inventory. Mr. Cross promised to make restitution of the converted receipts.

21. At this meeting Mr. Cross delivered to the defendant a check dated April 5, 1947 for $1,763, a note dated April 5, 1947 for $7,051.98, and the plaintiffs' telegram of April 3, 1947 to Cross covering the April 3rd shipment of cattle.

22. At this time Mr. Cross also advised Mr. Zeidman that another shipment of cattle would be coming forward on or about April 7, 1947. Nothing was said about terminating the two agreements of January 28, 1946.

23. The defendant, suspicious of Cross' good faith, did not send its check covering the April 3rd shipment to the plaintiff immediately, but waited for Cross' check of April 5th to clear the bank.

24. By notice dated April 10, 1947 the defendant's bank notified the defendant that Cross had stopped payment on the April 5th check, and returned this check to the defendant uncollected. The defendant received this notice and the returned check on April 11th.

25. On April 12, 1947 a second meeting was held between the aforementioned representatives of the defendant and Cross and their respective attorneys.

26. This second meeting was held to go over Cross' financial condition, because Cross had stopped payment of the April 5th check, because Cross had not made restitution of the converted receipts, and because Mr. Cross had continued to convert receipts to his own or the company's use.

27. At this meeting the agreements of January 28, 1946 were cancelled, and Cross agreed to assign all invoices of sales and all receipts collected to the defendant and to allow the defendant to place an agent in Cross' plant in order to supervise this assignment of invoices and collection of receipts.

28. During the week of April 7, 1947 the defendant sent an employee to Cross' plant to inspect Cross' books, but he was denied access to these books.

29. During the week of April 14, 1947 the defendant sent two employees to Cross' plant who remained there as long as there was meat on hand to sell.

30. These two employees of the defendant stamped all Cross' invoices which were sent out on and after April 14, 1947 with

instructions to the effect that all payments were to be made directly to the defendant's office.

31. On and after April 14, 1947 all money received at Cross' plant in payment of invoices was turned over to the defendant.

32. No more shipments of cattle or livestock were received by Cross after April 14, 1947.

33. On or about April 22, 1947 all inventory of meat and by-products had been sold and the plant was closed.

34. On or about May 14, 1947, an involuntary petition in bankruptcy was filed against Cross in New Jersey.

35. On April 4, 1947 Cross' inventory of slaughtered and unslaughtered cattle on their premises amounted to $117,119.

36. On April 5, 1947 Cross was indebted to the defendant on receivables for $95,-744.15 and on inventory for $95,020.32, or a total indebtedness of $190,764.47.

37. On April 10, 1947 Cross slaughtered the April 3rd shipment of cattle which had a dressed weight of 16,563 pounds of beef.

38. On April 14, 1947 when the defendant placed its employees in Cross' plant, at least three-fourths of the beef from the April 3rd shipment of cattle and all of the cattle from the April 7th shipment were on hand in Cross' plant.

39. On April 14, 1947 the defendant knew that the April 3rd and 7th shipments of cattle had not been paid for, and knew, or should have known, that the aforementioned beef and cattle from these shipments were on hand.

40. On April 14 and 15, 1947 Cross slaughtered the April 7th shipment of cattle which had a dressed weight of 30,377 pounds of beef.

41. On April 15, 1947 Cross, at the direction of the defendant, returned 47 calves to a seller in Virginia because they were not paid for, and because it might have taken a long time to dispose of the meat and by-products.

42. Between April 14 and May 19, 1947, the defendant collected $103,316.87 in receipts from the sale of Cross' products.

43. The beef in the April 3rd and 7th shipments sold for at least an average price of $0.42 per pound, and the by-products from the April 7th shipment sold for at least $22.87 per steer.

44. Of the amount the defendant collected between April 14 and May 19, 1947, at last $5,217.35 was from the sale of beef from the April 3rd shipment, $12,757.34 from the sale of beef from the April 7th shipment, and $983.41 from the sale of the by-products of the April 7th shipment. Thus, at least $18,958.10 of the receipts collected during this period were from the meat and by-products of the April 3rd and 7th shipments of cattle.

45. At no time did any of the defendants' employees or agents tell any of Cross' employees or agents that the defendant would pay the plaintiffs for the April 3rd and 7th shipments of cattle.

46. The plaintiffs have not been paid for the April 3rd and 7th shipments of cattle.

### Discussion.

This has been and is a very perplexing case. The testimony is replete with contradictions; almost every witness either contradicted himself outright or by his demeanor on the witness stand made his testimony incredible to some degree. Even each side's theory of the case is in itself inconsistent at some point.

The above findings of fact represent the situation as proved by the credible evidence and admissions.

Cross, individually, was manipulating his financial dealings so that somebody, not Cross, was going to be stuck for the price of these cattle. Mr. Zeidman suspected Cross' financial embarrassment and double dealings before the plaintiffs knew anything was amiss.

When the defendant received Cross' check dated April 5, 1947, and was notified about the April 3rd and 7th shipments of cattle, its relationship with Cross was being strained to the breaking point. Zeidman reasoned that if the check was good, he would then continue to make advancements under the agreements of January 28,

1946, meanwhile hoping for restitution of the converted receipts, but at the same time holding over Cross' head the club of cancelling these agreements and forcing the assignment of all invoices and receipts. However, if the check was bad, then he would immediately cancel these agreements and force such an assignment. As it turned out, the check was bad, the defendant advanced nothing, but collected most, if not all, of these receipts.

The problem is not before me as to whether all the receipts collected by the defendant between April 14 and May 19, 1947 should be turned over to the Trustee in Bankruptcy. However, the plaintiffs cannot recover that part of those receipts which came from the beef and by-products of the April 3rd and 7th shipments. Under Section 19 of the Uniform Sales Act, which has been adopted by Illinois, Ill.Rev. Stat.1949, c. 121½, § 19, New Jersey, N.J. S.A. 46:30–25, and Pennsylvania, 69 P.S. § 143, title to that cattle passed to Cross, and the plaintiffs became unsecured creditors of Cross having no lien or rights against that merchandise or the proceeds therefrom.

The plaintiffs' theory of recovery was a third party beneficiary contract based upon alleged promises made by Zeidman to Cross that the defendant would pay the plaintiffs. An examination of the testimony does not justify, to my mind, a finding that these alleged promises were ever made.

It is inconceivable to think that Zeidman would promise to pay 100% of the purchase price of the April 3rd shipment when at a conference Zeidman complained that Cross had converted receipts due Zeidman. At the same time Cross had just handed Zeidman a check dated April 5 for 25%. Zeidman was suspicious of Cross' good faith and wanted to await clearance of Cross' check. The check was never paid.

The defendant's employee had been given the run around by Cross and denied access to Cross' books. It seems unlikely that under such circumstances the defendant would agree to pay for the cattle.

The plaintiffs never had any contact or business dealings with the defendant prior to the institution of this action.

Since the plaintiffs have not proved these alleged promises of the defendant to Cross by a preponderance of the evidence, there is no third party beneficiary contract capable of enforcement, and judgment must be for the defendant.

Conclusions of Law.

1. This Court has jurisdiction of this case.

2. The defendant did not enter into a contract with Louis A. Cross Company wherein the defendant promised Louis A. Cross Company to pay the plaintiffs direct for the shipments of cattle on April 3 and 7, 1947.

3. The plaintiffs' complaint is dismissed, and judgment is entered for the defendant.